## HENRY JONES *vs.* CHARLES ROBBINS.

A statute conferring on police courts concurrent jurisdiction with the court of common pleas and the municipal court of Boston " of all larcenies where money or other property stolen shall not be alleged to exceed the value of fifty dollars, in all which cases the punishment imposed may be such as the court of common pleas and the municipal court are authorized to inflict by existing laws," includes aggravated as well as simple larcenies.

A statute, which authorizes a single magistrate to try and pass sentence in a criminal case, but gives the defendant an unqualified and unfettered right of appeal, and a trial by jury in the appellate court, subject only to the requirement of giving bail for his appearance there, or, in default of such bail, being committed to jail, is not unconstitutional as impairing the right of trial by jury. THOMAS, J. dissenting.

A statute, which gives a single magistrate authority to try an offence punishable by imprisonment in the state prison, without presentment by a grand jury, violates the twelfth article of the Declaration of Rights. MERRICK, J. dissenting.

PETITION for a writ of *habeas corpus.* The facts of the case, which was argued in the last vacation, by *F. W. Hurd,* for the petitioner, and *G. W. Cooley,* (County Attorney,) for the respondent, appear in the opinion of the majority of the court, as delivered by

SHAW, C. J. The petitioner sets forth that he is a prisoner in the house of correction in the city of Boston, upon a mittimus or warrant, issued by the police court of the city, under a conviction in that court, and a sentence thereon to an imprisonment at hard labor in the house of correction for the term of six months.

It appears by the complaint and conviction thereon, upon a plea of guilty, that he was charged and convicted of stealing in a building, to wit, in the shop of one Horace Mecum, one gold ring, of the value of fourteen dollars, of the goods and chattels of said Mecum.

1. It is contended, on the part of the petitioner, that this conviction and commitment are inoperative and void, for the reason that the police court, though it had jurisdiction to receive this complaint, and, upon the arrest of the party, to examine and bind him over for trial, still had no jurisdiction to try and pass sentence upon him; because the complaint and judgment manifestly

28 *

describe an aggravated, and not a simple larceny, an offence which, by the terms of the law prescribing a punishment therefor, is punishable by imprisonment in the state prison, not more than five years, or by fine and imprisonment in the jail or house of correction. Rev. Sts. c. 126, § 14; c. 143, § 19. This we suppose to be the true distinction; that if a warrant of commitment be issued by a court of general jurisdiction, although it be erroneous and not conformable to law, it will still stand good, unless examined and reversed by writ of error or otherwise; but if a court of special and limited jurisdiction exceed the authority conferred, and issue a warrant of commitment, the judgment is void, and not merely voidable, and the commitment under it is illegal, and may be inquired into on *habeas corpus*, and if the commitment is wrong, the party may be discharged.

This we have regarded as a very grave and important question, the more so because we understand that a difference of opinion and adjudication has arisen, upon this subject, between the municipal court of this city and the police court; and such a difference must obviously be highly unfavorable to the administration of justice in the courts of criminal jurisdiction.* Considering this as a proper and convenient mode of bringing this question to the consideration of this court, we have endeavored, after argument, to give it the same deliberate consideration, as if it had been brought before us by writ of error.

In support of the jurisdiction of the police court, it is urged, that this jurisdiction is expressly conferred by *St.* 1855, c. 448. And it becomes necessary therefore to examine that statute.

The first section provides that " the several police courts of this commonwealth shall have concurrent jurisdiction with the municipal court of Boston and the court of common pleas [that is, the police court of Boston with the municipal court of Boston, and the police courts in other counties with the court of common pleas for such counties] of all larcenies where money

---

* See *Commonwealth* v. *Brown*, 21 Law Reporter, 23; *Commonwealth* v. *Melegan*, 21 Law Reporter, 33.

or other property stolen shall not be alleged to exceed the value of fifty dollars ; in all which cases the punishment imposed may be such as the court of common pleas and the municipal court are authorized to inflict by existing laws."

Construed by itself, this would appear to authorize the police court to hear and determine all cases of larceny, where the property stolen does not exceed $50, and by these terms would include aggravated as well as simple larcenies, limited only by the amount of the property stolen. But it is argued on the other hand that, construed in reference to all the previous statutes on the same subject, according to the well known rule of exposition that all statutes *in pari materia* are to be taken into consideration, the legislature must necessarily have intended to limit this jurisdiction to cases of simple larceny only. The argument is, that if it can be shown that the purpose of the legislature was to confine this jurisdiction to simple larcenies alone, then it would follow that the terms " all larcenies " would be controlled and modified, and keep the jurisdiction of police courts within the original prescribed limits, that of justices of the peace in cases of petit larceny and other trivial offences. But it is a question whether, if it could be construed to be limited to simple larceny, this consequence would follow; because it is expressly provided by this *St.* of 1855, that such police court shall have the power to impose the same punishment as the court of common pleas and municipal court. But by the Rev. Sts. *c.* 126, § 17, such simple larceny, of property under $100, upon a conviction in an upper court, may be punished by imprisonment one year in the state prison. The same power therefore would, by the terms of this act, be given to the police court by this statute, whether in cases of simple or aggravated larceny.

It becomes necessary, therefore, it seems to us, in order to put a just construction on this statute, to look back as far at least as the Rev. Sts., and consider these and the subsequent legislative acts in reference to the principles and provisions of the Constitution of the Commonwealth.

In considering what are the provisions of the Rev. Sts. for the punishment of larcenies, we must distinguish between cases

where the real offence intended to be punished is stealing, and the cases where another offence is the principal thing against which the penalty is levelled, although stealing is stated as an ingredient; such as cases of breaking and entering a dwelling-house, shop, vessel or meeting-house, by night or by day, and stealing therefrom. These are either burglary, or acts in the nature of burglary, where the theft is not the leading or princi pal object of punishment. These are enumerated in the Rev. Sts. *c.* 126, §§ 9–14, and are all of this character, except perhaps the first clause of § 14, " stealing in a dwelling-house, shop," &c.

Then come §§ 15 and 16, and enumerate several aggravated larcenies, that is, cases where the gravamen of the offence is stealing, but aggravated by the circumstance that it was in a building on fire, or of property exposed by removal on an alarm of fire, or from the person of another. In these cases, the value of the property thus stolen is not stated as an ingredient or qualification of the offence; but it derives its aggravated char acter from the place, time or circumstances under which a larceny to any amount, however small, may be brought within its provisions. The terms " aggravated " larceny, and " simple " larceny, under our statutes, are not to be confounded with the terms " grand " and " petit " larceny at common law, where the distinction consisted solely in the value of the property stolen. Section 17 enumerates a long list of articles, apparently intend-ing to include every species of property susceptible of being the subject of larceny, and provides that the stealing of any or either of them, mentioning no time or place as matter of aggra-vation, shall be punished, if the value be over $100, by impris-onment in the state prison not exceeding five years, or by fine and imprisonment, and, if under $100, by state prison not ex-ceeding one year, or by fine and imprisonment. These are all simple larcenies, not because so denominated in the statute, but because no qualification is annexed to render them aggravated · and the value of the property is made an essential element in fixing the punishment.

Here then we have, in addition to burglarious offences, of which stealing may be a part, two distinct classes or species of

larceny, which may be, conveniently enough, denominated " aggravated " and " simple," because they are differently described and punished ; the former, manifestly being more severely punished, and without regard to value, must be deemed aggravated ; and the latter, attended by none of the aggravating circumstances, and varied in punishment only by the larger or smaller alleged value of the property stolen, are simple.

Then comes the 18th section conferring jurisdiction; and it provides, that justices of the peace and police courts shall have concurrent jurisdiction with the court of common pleas and municipal court of all the larcenies mentioned in the preceding section namely, simple larcenies, when the property stolen is not alleged to exceed $15, and of all other larcenies whatever, when the property stolen is not alleged to exceed $5.

What was the legal effect of this distinction ? If, as is suggested in the argument against the jurisdiction of the police court, this was not intended to include aggravated larcenies under $5, but other larcenies of like kind, which might have been omitted in the specific enumeration — that is, all simple larcenies — then there could have been no reason for limiting such " other larcenies " to stealing property of smaller value, only $5 ; but it would have included all others of like kind, without distinguishing the value. Besides, the justices' jurisdiction, extending to $15 in value, is limited to the larcenies mentioned in the sixteenth section, that is, simple; then a further jurisdiction, in all other larcenies of property not exceeding $5, seems necessarily to extend the jurisdiction to the other larcenies described in the preceding sections, which were the aggravated. The more natural supposition is, that the legislature well knew that, although a theft may, in many cases, be aggravated by stealing from a shop an article of small value, it may still, in point of fact, in many other cases, come under the category of a petty offence, punishable by fine or imprisonment, or at most for a brief period in the house of correction. Stealing a silver spoon from a shop may, under some circumstances, be no more heinous an offence than stealing the same article in a field to which it has been taken for use and left exposed.

It seems to us therefore, that the most natural construction of these clauses, taken together, is this; that jurisdiction was intended, according to a long course of practice, to be given to a justice of the peace or police court, in cases of petty offences and small pilfering, though amounting in law to larceny, and, of course, felony at common law — in case of simple larceny to the amount of $15, and in an aggravated larceny not exceeding $5; and that these should be deemed petty, and be punishable by a justice of the peace; but the limitation of his power, in cases where he should finally try and decide and pass sentence, was to be found in the express limitation of the maximum of punishment to fine and imprisonment, excluding the state prison.

It seems manifest therefore, that the legislature did define certain offences by one general designation, and to a certain extent gave a concurrent jurisdiction to different tribunals, and did provide, that an offence coming under that designation, if conviction was had, and in one of those tribunals, might be punishable by imprisonment one year in the state prison; but if conviction was had before a justice of the peace, it would not be subjected to a state prison punishment.

This would, at first view, seem to be an anomaly in the law; but probably it was founded on the obvious consideration, that a law, to prohibit and punish offences, must, in its nature, be prospective; and must be general in its terms, broad enough to embrace the most heinous offences, and also the most trivial, which can be embraced in such general definition, the punishment varying from one very severe to one very slight, according to the actual nature of the offence. But when it appears, from the complaint actually made, and the facts adduced in support of it, that it is in fact a trivial and unimportant offence in its actual guilt, it shall be punished accordingly; and the legislature probably thought it not unsafe, when on such complaint being made and evidence offered, it should appear to fall within the class of petty offences, to permit the justice of the peace or police court to proceed to try the party complained of, saving to him an unqualified right of appeal to a court sitting with a

jury, such a right of appeal being attended with no other bur den but that of giving bail or standing committed, not by way of punishment, but simply to secure the person of the accused to be ready to take his trial and abide the judgment. This inconvenience every party, from the necessity of the case, must be subject to, during the time which elapses between his arrest and trial; and is an inconvenience to which the party thus convicted would be subject, if, instead of a conviction and appeal, the justice of the peace or police court had ordered him, after examination, to give bail for his appearance at the higher court for a first trial, or stand committed, which would be the only alternative.

That this was not hasty or inadvertent legislation, is manifest from the fact, that the same provisions are made as to the relative jurisdiction and powers of courts of common pleas and justices of the peace in § 23 of the same chapter, in relation to receivers of stolen goods.

The question then recurs, whether there is any statute, since the Rev. Sts., which enlarges the jurisdiction of justices of the peace or police courts, so as, in terms, to authorize them to sentence a convict, in any case, to the state prison. Several statutes have been cited; we will refer to them.

The *St.* of 1843, *c.* 1, § 1, provides for larceny in a dwelling-house in the night time. No jurisdiction is given to justices of the peace.

The *St.* of 1845, *c.* 28, provides for stealing in the night time from any shop, office, bank, &c.

The *St.* of 1851, *c.* 151, extends the provisions of the law of larceny to trespass on the realty, and carrying away property when severed; and by § 3 " such courts and justices are to have jurisdiction of such simple or aggravated larcenies," as if the property were personal.

In the *St.* of 1851, *c.* 156, the three first sections relate to cases of breaking and entering. By § 4, larceny " by stealing in any building " is punishable by state prison, or fine and imprisonment in the jail or house of correction. We do not perceive that this provision varies the law; except in an increase of the

punishment, it does not appear to alter the jurisdiction as given by the Rev. Sts.

The *St.* of 1852, *c.* 4, is an enlargement and amendment of the *St.* of 1851, *c.* 156. The original act, of course, by its general effect, without special provisions, gave jurisdiction to the court of common pleas and municipal court. But this statute, as to the *St.* of 1851, *c.* 156, § 4, which provides a punishment for aggravated larceny, not varying the maximum or minimum of punishment, gives jurisdiction to justices of the peace and police courts, to hear, try and punish, by fine not exceeding $20, or by imprisonment in the common jail or house of correction, not exceeding one year, where the property stolen does not exceed $10.

Such, we believe, was the state of the law upon this subject, when the *St.* of 1855 was passed. By every previous act, if the law did in terms give to a police court or justice of the peace jurisdiction, at their discretion, to hear, decide and pass sentence, it was always accompanied with the two restrictions, that the accused had an unqualified right of appeal to a court sitting with a jury, and a trial by jury therein; and the power of inflicting punishment was limited, as its maximum, to fine and imprisonment in jail or house of correction, and did not extend to imprisonment in the state prison.

The *St.* of 1855, *c.* 448, extends the jurisdiction of police courts, (not of justices of the peace,) by which they shall have concurrent jurisdiction with the court of common pleas or municipal court, when the property alleged to be stolen does not exceed $50, in which cases the punishment imposed may be such as the court of common pleas and municipal court are authorized to inflict by existing laws. By this reference to existing laws, and finding that those courts, in cases of simple larceny under $100, including of course all cases under $5, have power to punish by confinement to hard labor in the state prison, it follows that this statute purports to confer a like power on police courts. Now, as a police court sits without a jury, and, according to the general policy of the law, exercises the powers of a justice of the peace within certain local limits, no distinc-

tion is perceived between conferring this jurisdiction on police courts and on justices of the peace by the legislature.

We are then brought, in the construction of this statute, to two questions: 1st. Whether this jurisdiction is limited to simple larcenies only, and does not extend in any case to aggravated larcenies; and 2d. If it does extend to aggravated larcenies, and authorizes a police court to sentence to the state prison, for one or five years, whether the statute is not unconstitutional, inoperative and void.

For the reasons already given, we are of opinion that this statute, by its terms, and construed with reference to all other statutes on the subject, cannot be limited in its terms to simple larcenies; but that by " all larcenies " was intended that class of larcenies known as aggravated, (not of course where a breaking and entering a dwelling-house or shop, by night or day, enters into and constitutes the gravamen of the offence,) and that it cannot be limited to simple larcenies. But even if we could construe the *St.* of 1855 as intended by the legislature to limit the jurisdiction to simple larceny only, the section authorizing a police court to impose the same punishment which a court of common pleas or municipal court may inflict would authorize the police court to sentence one, convicted of simply larceny, to the state prison for one year.

2. But the next question is, if it does bear the construction that it extends to aggravated larceny, whether it was competent for the legislature to make such a law, or, in other words, whether it is not repugnant to the Constitution of this commonwealth, and so inoperative and void, so that, if the conviction on which the petitioner is committed stands upon the authority of this statute alone, it is not illegal? And upon this last point, we think it must depend upon this statute only.

By the revised statutes, as we construe them, justices of the peace and police courts had jurisdiction to try and pass sentence in cases of simple larceny, where the property alleged to be stolen does not exceed $15, and in aggravated larcenies, not coupled with any burglarious act, where the property does not exceed $5. The *St.* of 1851, *c.* 156, § 4, provided for punishing

an aggravated larceny, by stealing in a building, under the usual penalty of state prison five years, or by fine, or by imprisonment in the house of correction or county jail. Then, by *St.* 1852, *c.* 4, this last statute was altered and amended by giving police courts and justices of the peace jurisdiction to try, and decide and pass sentence, by fine not exceeding $20, or imprisonment in the jail or house of correction not exceeding one year, where the property stolen does not exceed $10.

It appears therefore, that no statute, previous to that of 1855, has extended this jurisdiction, in case of aggravated larceny, to any case where the property alleged to have been stolen exceeds $10. But in the case before us, the complaint against Jones alleged that the property stolen from a building was of the value of $14, and therefore we think it was not within the jurisdiction of the police court, unless by the *St.* of 1855. We are therefore necessarily brought to the inquiry, Whether that act is unconstitional? Such a question must always be regarded as one of great delicacy, and will be entertained by a judicial tribunal in those cases only, where it is essential to the public welfare or the just rights of parties.

It first occurred to us to see whether we might not consider the two parts of the *St.* of 1855, to wit, that which confers jurisdiction on police courts, concurrently with the court of common pleas and municipal court, where the property does not exceed in value $50; and that part which gives to police courts the same power with the court of common pleas to inflict punishment, including imprisonment in the state prison; as distinct.

It is undoubtedly a correct rule of construing a statute in reference to its constitutionality, to consider only such part void as is plainly repugnant to the Constitution; and therefore, where there are different provisions in the same statute, so distinct and independent, that the one may not have been the motive or inducement to the other, one may be held valid and the other void. *Ex parte Wellington*, 16 Pick. 95–97. *Fisher v. Mc Girr*, 1 Gray, 21. But in bringing the case in question to this test, we think it cannot fall within this distinction. Both in the Rev. Sts. and the *St.* of 1852, the value of the property

stolen seems to have been regarded as an important ingredient in determining whether or not a police court should have juris-diction to try and pass sentence, where the nature of such pun-ishment was expressly so limited as to exclude imprisonment in the state prison. An aggravated larceny, where the property stolen is $50, can hardly come under the denomination of pilfer-ing, or a petty offence ; on the contrary, it is an offence of considerable magnitude, in view of which we are not prepared to say, that the legislature would have extended the jurisdic-tion to a police court, if they had not accompanied it with a power in that court to inflict the same punishment as the court of common pleas or municipal court was authorized to inflict. We think therefore that the two parts of this enactment were not separate and independent of each other, but the one may have been the motive, inducement or consideration on which the other was founded, and that they must stand or fall to-gether. *Warren* v. *Mayor & Aldermen of Charlestown*, 2 Gray, 99.

The provisions of the Constitution, vesting power in the legis-lature to make all useful and wholesome laws, and to erect and create judicatories and courts of record or other courts for the hearing and determining all crimes and offences, if there were no restraint upon such power in the Constitution, would be broad enough to warrant the enactment in question. But it is true that, by the Bill of Rights, various restrictions are placed upon this general power, intended for the better security of per-sons accused of crime against arbitrary and hasty public prose-cutions ; and the question is, whether the Bill of Rights, by its provisions, or by necessary implication, does not restrict the legislature from making laws subjecting any party to an infa-mous punishment, by a prosecution not commencing with an indictment or presentment of a grand jury ? If not so restrained, then it is manifest that, under the law which we have before us, the magistrate might sentence a party accused to imprison-ment in the state prison for five years ; and it would also follow, that the legislature might make a law, giving to the justices of peace and police courts, sitting without a traverse jury, the

power to hear, determine and pass sentence, to any extent of punishment warranted by law, provided only that such authority be accompanied by a provision, that the party convicted shall have a clear and unqualified right of appeal to a court sitting with a traverse jury, with a right of trial by such jury, still without the previous intervention of a grand jury; and thus, by statute, grand juries may be dispensed with altogether, in cases not capital. These consequences of the construction of the Constitution in favor of the validity of this law are so momentous, that we are called upon to give it the most serious and deliberate consideration, before deciding this question in the affirmative.

In considering constitutional provisions, especially those embraced in the Declaration of Rights, and the amendments of the Constitution of the United States, in the nature of a bill of rights, we are rather to regard them as the annunciation of great and fundamental principles, to be always held in regard, both morally and legally, by those who make and those who administer the law, under the form of government to which they are appended, than as precise and positive directions and rules of action; and, therefore, in construing them, we are to look at the spirit and purpose of them, as well as the letter. Many of them are so obviously dictated by natural justice and common sense, and would be so plainly obligatory upon the consciences of legislators and judges, without any express declaration, that some of the framers of state constitutions, and even the convention which formed the Constitution of the United States, did not originally prefix a declaration of rights.

Art. 12 in our own bill of rights is as follows: " No subject shall be held to answer for any crime or offence, until the same is fully and plainly, substantially and formally, described to him; or be compelled to accuse, or furnish evidence against himself; and every subject shall have a right to produce all proofs that may be favorable to him; to meet the witnesses against him face to face, and be fully heard in his defence, by himself or his counsel, at his election. And no subject shall be arrested, imprisoned, despoiled or deprived of his property, immunities or

Jones *v.* Robbins.

privileges, put out of the protection of the law, exiled, or deprived of his life, liberty or estate, but by the judgment of his peers or the law of the land. And the legislature shall not make any law that shall subject any person to a capital or infamous pun· ishment, excepting for the government of the army and navy without trial by jury."

The last clause, which seems to have been added for greater caution, prohibiting the legislature from making any law which shall subject any person to a " capital " or " infamous punish· ment," excepting for the government of the army and navy, without trial by jury, is somewhat more explicit than the pre· ceding clause, " judgment of his peers," and may be equivalent to the clause in the sixth article of amendment of the Con- stitution of the United States, declaring that, " in all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury." We believe it has been so practically understood ; and where, by the terms of any law, a justice of the peace or police court has been authorized to hear and pass sentence, it has always been accompanied by a right of appeal. And we believe it has been generally understood and practised here and in Maine, and perhaps in other states having a similar provision, that as the object of the clause is to secure a benefit to the accused, which he may avail himself of or waive, at his own election ; and as the purpose of the provis- ion is to secure the right, without directing the mode in which it shall be enjoyed ; it is not violated by an act of legislation, which authorizes a single magistrate to try and pass sentence, provided the act contains a provision that the party shall have an unqualified and unfettered right of appeal, and a trial by jury in the appellate court, subject only to the common liability to give bail, or to be committed to jail, to ensure his appearance and to abide the judgment of the court appealed to. This is a necessary inconvenience, as is also the delay of the trial till the sitting of such court ; they are the same and no greater than they would be in case the magistrate, instead of passing sen- tence, should, on examination, bind the accused over, or, as the necessary alternative, commit him to jail. Such seems to have

29 *

been the construction of a similar provision in other states. *Emerick* v. *Harris*, 1 Binn. 416. *Murphy* v. *People*, 2 Cow. 815. *Jackson* v. *Wood*, 2 Conn. 819. *Beers* v. *Beers*, 4 Conn. 535. *Sullivan* v. *Adams*, 3 Gray, 477. It appears to us, therefore, that such a provision is not void, as a violation of that clause, which, in criminal cases, secures to the accused a right of trial by jury.

Still this leaves the other question, whether a party can be made subject to a punishment for a term of years in the state prison, without indictment or presentment of a grand jury.

We are then to consider the prohibition to be found in the other part of the 12th article. In the commencement of the article, "no subject shall be held to answer for any crime or offence until the same is fully and plainly, substantially and formally, described to him," the makers very accurately describe a good indictment; and it is very probable that this was the predominant idea in their minds, though an information, complaint or other form of charge might conform to the same requisitions, and therefore this provision is not conclusive. But the subsequent clause goes further: "no man shall be arrested, imprisoned, exiled, or deprived of his life, liberty or estate, but by the judgment of his peers, or the law of the land."

This clause, in its whole structure, is so manifestly conformable to the words of *Magna Charta*, that we are not to consider it as a newly invented phrase, first used by the makers of our constitution; but we are to look at it as the adoption of one of the great securities of private right, handed down to us as among the liberties and privileges which our ancestors enjoyed at the time of their emigration, and claimed to hold and retain as their birthright.

These terms, in this connection, cannot, we think, be used in their most bald and literal sense to mean the law of the land at the time of the trial; because the laws may be shaped and altered by the legislature, from time to time; and such a provision, intended to prohibit the making of any law impairing the ancient rights and liberties of the subject, would under such a construction be wholly nugatory and void. The legislature

might simply change the law by statute, and thus remove the landmark and the barrier intended to be set up by this provision in the Bill of Rights. It must therefore have intended the ancient established law and course of legal proceedings, by an adherence to which our ancestors in England, before the settlement of this country, and the emigrants themselves and their descendants, had found safety for their personal rights. Lord Coke, in commenting upon this clause of *Magna Charta — nisi per legem terræ* — adopts the construction that the clause meant " without process of law, that is, by indictment or presentment of good and lawful men." 2 Inst. 50. This may not be conclusive ; but, being a construction adopted by a writer of high authority, before the emigration of our ancestors, it has a tendency to show how it was then understood.

Chancellor Kent, after setting forth the rights and liberties claimed by the people of this country, and in explanation of these words from *Magna Charta*, says : " The words *by the law of the land*, as used originally in *Magna Charta* in reference to this subject, are understood to mean due process of law, that is, by indictment or presentment of good and lawful men," and he relies on the authority of Lord Coke for the correctness of this exposition. 2 Kent Com. (6th ed.) 13.

The same view of this clause in our constitution is taken by Judge Story in his Commentaries on the Constitution. § 1783.

It is well understood that, prior to and during the American Revolution, and especially from and after the Declaration of Independence, when new constitutions for the states were to be formed, it was desirable that the form of government, and the powers vested in its different departments, should be expressed and limited, in written constitutions, being fundamental laws, emanating from the people, and unalterable, but by the same original authority ; and for the better security of the rights of life, liberty and property, it was deemed essential that the fundamental principles of free government should be set down in a few plain, clear and intelligible propositions, for the better guidance and control, both of legislators and magistrates. This would be useful as a guide and monitor of public opinion, as a

check upon all who professed to be governed by a sense of duty strengthened by an oath to perform it, and would be more especially necessary where such written constitution itself was to be regarded as law for the government of the judicial department, and necessarily required to bring every legislative enactment to the test of the Constitution. Most of the state constitutions did contain these declarations, more or less detailed and explicit; but the general purpose was to assert and maintain the great rights of English subjects, as they had been maintained by the ancient laws, and the actual enjoyment of civil rights under them. "The sense of America was," says Chancellor Kent, "more fully ascertained, and more explicitly and solemnly promulgated, in the memorable Declaration of Rights of the first continental congress, in October 1774, and which was a representation of all the states except Georgia. That declaration contained the assertion of several great and fundamental principles of American liberty; and it constituted the basis of those subsequent bills of rights which, under various modifications, pervaded all our constitutional charters." 2 Kent Com. 5, 6.

The right of individual citizens to be secure from an open and public accusation of crime, and from the trouble, expense and anxiety of a public trial, before a probable cause is established by the presentment and indictment of a grand jury, in case of high offences, is justly regarded as one of the securities to the innocent against hasty, malicious and oppressive public prosecutions, and as one of the ancient immunities and privileges of English liberty.

In summing up these privileges, as intended to be secured by the American constitutions, Chancellor Kent states them thus: "The right of personal security is guarded by provisions transcribed into the constitutions in this country from *Magna Charta* and other fundamental acts of the English parliament, and enforced by additional and more precise injunctions. The substance of them is, that no person, except on impeachment, and in cases arising in the naval and military service, shall be held to answer for a capital or otherwise infamous crime, or for any offence above the common law degree of petit larceny, unless

he shall have been previously charged on the presentment or in-
dictment of a grand jury." 2 Kent Com. 12.

The same view of the effect of the use of the term "law of
the land," as used in the American constitutions, has been
adopted in the State of Maine, where it is held to be prose-
cution according to the due course of law, including trial by
jury, and prosecution by indictment, for all the higher crimes
and offences. *Saco* v. *Wentworth*, 37 Maine, 172. So in New
York. By Bronson, J., in *Taylor* v. *Porter*, 4 Hill, 145.

We are then brought to the consideration of the correspond-
ing provision in the Constitution of the United States, made and
adopted seven or eight years after that of Massachusetts; and
compare the two provisions together. It is well known how
this provision, by way of amendment, originated. The original
constitution, as reported by the federal convention at Philadel-
phia, contained no Bill of Rights, and it was strenuously
objected to on that account. In order to ensure the adoption
of the constitution in Massachusetts, it was proposed to com
bine with the vote of ratification certain specified amendments,
one of which was the clause afterwards adopted by way of
amendment, as hereafter mentioned. This was proposed by
John Hancock, the president of the convention, and this specific
provision advocated by Governor Bowdoin and other members.
The amendment, as adopted, art. 5, was as follows : " No per-
son shall be held to answer for a capital or otherwise infamous
crime, unless on a presentment or indictment of a grand jury,
except in cases arising in the land or naval forces, or in the
militia when in actual service in time of war or public
danger."

Could this provision be held to bind the several states in their
legislation and jurisprudence, it would put the matter beyond
doubt, except, perhaps, the difficulty of drawing the precise line
between " infamous " and minor or petty offences. But we take
it to be now well settled, by strong reasons as well as decisive
authority, that this fifth amendment was designed solely to put
a limit upon the authority of congress, in framing laws for the
government of the United States, and did not extend to the

laws of the several states. *Barron* v. *Mayor &c. of Baltimore* 7 Pet. 243. *Commonwealth* v. *Hitchings*, 5 Gray, 485.

But as a commentary upon the less precise and explicit terms of our own declaration of rights, in providing that no subject shall be deprived of life, liberty or property, but by the judgment of his peers or the law of the land, it seems to us to have a legitimate bearing upon the question we are examining. It is the more significant when we consider that it originated in Massachusetts, a few years later, and was adopted by nearly the same set of public men, but after some other constitutions had been under discussion, and when the ideas of American statesmen on these subjects had become more exact and definite.

It having been stated by Lord Coke that, by the "law of the land" was intended a due course of proceeding, according to the established rules and practice of the courts of common law, it may perhaps be suggested, that this might include other modes of proceeding, sanctioned by the common law, the most familiar of which are, by informations of various kinds, by the officers of the crown in the name of the king. But in reply to this it may be said, that Lord Coke himself explains his own meaning by saying, "the law of the land," as expressed in *Magna Charta*, was intended due process of law, that is, by indictment or presentment of good and lawful men. And further, it is stated, on the authority of Blackstone, that informations of every kind are confined by the constitutional law to misdemeanors only. 4 Bl. Com. 310. And though it is true, that many misdemeanors are regarded as acts of criminality, highly injurious to the State, and punished with severity, yet they are of a grade inferior to treason and felony. And, in this country, though informations were probably more rare, yet we suppose they were in use mostly for the purpose of preventing negligence and enforcing the performance of public duties on the part of public officers, corporations and the like; yet Mr. Dane says, they are confined, by our constitutional laws, to mere misdemeanors, and adds that, by the constitutions of several individual states, and by an amendment of the Constitution of the United States, they cannot be used where either capital or infamous punishment is inflicted. 7 Dane Ab. 280.

Thus it appears that Mr. Dane, eminent both as a statesman and jurist, and who was a contemporary with the authors of the constitutions, puts the same construction upon the Massachusetts Bill of Rights, and the amendment of the Constitution of the United States. The article in the Massachusetts Bill of Rights, in the clause following the " law of the land," adds, " and the legislature shall not make any law that shall subject any person to a capital or infamous punishment, excepting for the government of the army and navy, without trial by jury." These terms, " capital or infamous punishment," used in contra distinction to all smaller and minor correctional punishments being embraced in the same article, and applicable to the two rights so similar, that of indictment by a grand jury, and a trial of that indictment by a traverse jury, are rightly held to apply to both of these subjects.

It seems therefore quite manifest, that the makers of the Constitution of the Commonwealth intended to make a marked distinction between crimes of great magnitude and atrocity, and to secure every person against accusation and trial for them without the previous interposition of a grand jury in the first instance; and to leave minor and petty offences to be prosecuted without these formalities, subject only to this restriction, that in all cases the party accused should have a right to a trial by jury, if he should desire it.

Then comes the practical difficulty, as before suggested, in ascertaining, in particular cases, what are infamous punishments, or, in other words, what are infamous crimes and offences. The technical distinction between felony and misdemeanor will not meet it; because all larceny is felony ; and yet petty larceny or pilfering, associated as it is with vagrancy and other small and not well defined offences, has always been punishable by a magistrate or justice of the peace, both under the colonial and provincial governments, from the earliest settlement of the country. Indeed, offences not above the degree of petit larceny are put, by Chancellor Kent, by way of example, as offences not infamous, and therefore not within the constitutional restriction. Nor is it easy to perceive precisely what was

intended in the article, by the term "infamous punishment." In general terms, all punishments which touch a man's person may, in a certain sense, be deemed disgraceful. The punishments in use under the colonial and provincial governments, were imprisonment in the common jail, hard labor in the work house or house of correction, pillory, sitting on the gallows, cropping one or both ears, branding on one or both cheeks, with indelible ink, the letter T for thief, or B for burglar, whipping, setting in the stocks; in case of larceny, restoration of threefold the value of the property stolen to the party injured, with a liability to be sold to service to pay it. Most of these must be deemed infamous, though, in fact, we are inclined to the belief that imprisonment in the common jail or work house was not formerly so regarded. And considering the ideas and usages which prevailed under the former governments of our state, it may well be doubted whether the penalty of sitting in the stocks, and whipping, limited to a small number of stripes, and confided to a magistrate or justice of the peace, were not regarded, at the time of the adoption of the Constitution, rather as correctional than as infamous punishments.

But whatever may have been the practical difficulty in distinguishing between infamous punishments and others, before the *St.* of 1812, *c.* 134, we think it was greatly relieved, if not removed, by that act, which made a radical change in the policy of the Commonwealth in regard to punishments for the higher and more atrocious crimes and offences. It provided that, on conviction before the supreme judicial court, (who, at that time, had exclusive jurisdiction of all such aggravated offences,) for any crime or misdemeanor then punishable by whipping, standing in the pillory, sitting on the gallows, or imprisonment in the common jail, the court might, in lieu of such punishments, sentence such convicts to suffer solitary imprisonment, and to be confined to hard labor for a time not exceeding five years, without any limit as to the minimum. This, it will be recollected, took place soon after the state prison at Charlestown had been organized and got into full operation. This practically took away all the degrading and ignominious punishments formerly

provided by law; and if it did not in terms extend to all of them, because not included in the enumeration, the acts authorizing them were afterwards repealed, in terms, in 1836, by the repealing act accompanying the revised statutes.

Now, it seems to us that, whether we consider the words "infamous punishment" in their popular meaning, or as they are understood by the Constitution and laws, a sentence to the state prison, for any term of time, must be considered as falling within them. The convict is placed in a public place of punishment, common to the whole state, subject to solitary imprisonment, to have his hair cropped, to be clothed in conspicuous prison dress, subjected to hard labor without pay, to hard fare, coarse and meagre food, and to severe discipline. Some of these a convict in the house of correction is subject to; but the house of correction, under that and the various names of workhouse and bridewell, has not the same character of infamy attached to it. Besides, the state prison, for any term of time, is now by law substituted for all the ignominious punishments formerly in use; and, unless this is infamous, then there is now no infamous punishment, other than capital. Now, when we consider that, since the adoption of the constitution, no act has been passed, before the one now under consideration, giving jurisdiction to a justice of the peace or police court, to try, decide and pass sentence, and no such jurisdiction has been exercised or claimed, unless where either, first, the statute creating and punishing the offence has limited the punishment to a penalty less than the state prison; or second, where, if the punishment of the offence was not thus limited, the power of a justice of the peace or police court, in cases where they were authorized to try and pass sentence, has not thus limited the punishment by the statute giving the jurisdiction; it leads to a strong conclusion of the general understanding of the legislators and jurists of Massachusetts, that punishment in the state prison is an infamous punishment, and cannot be imposed without both indictment and trial by jury.

We have already suggested, but it may be proper to repeat in conclusion, that although this jurisdiction does authorize a

justice of the peace or police court to pass sentence, it does not necessarily defeat or impair the right of trial by jury, by appeal; yet, as such trial on the appeal must necessarily be a trial on the original complaint, without indictment, it does take away that shield of protection from a party accused of crime, intended for his protection and security, when the punishment is infamous. As the statute in question does purport to confer on a police court the power to punish a convict, by the "infamous punishment" of imprisonment in the state prison, and the convict might be so punished by the police court, and, on appeal, by the appellate court, without an indictment by the grand jury, the court are of opinion that the act is unconstitutional, and, of course, inoperative and void; not because it confers jurisdiction on a police court, to take cognizance of an aggravated larceny, on complaint, and try and pass sentence; but because it authorizes a police court to punish by confinement in the state prison, both for aggravated and simple larceny. It follows, of course, that the jurisdiction, under which the petitioner was sentenced, was not legally conferred on the police court, and therefore that he is not legally liable to be held under the commitment, and, on these facts appearing on a return of the *habeas corpus*, he will be entitled to his discharge from confinement.

THOMAS, J. Concurring, for the most part, in the opinion expressed by the majority of the court, and in the result to which it leads, I have been brought to the same conclusion by a somewhat different, and, to myself, more satisfactory course of reasoning. This I have felt it my duty briefly to state, the more especially as I am obliged respectfully, but firmly, to dissent from some of the constitutional views to which the opinion just read has given the sanction of the court.

The construction of the statute seems to me very plain. By the terms " all larcenies " are embraced aggravated as well as simple. The limitation in the statute is only in the amount charged to be stolen.

It seems to me equally clear, however difficult it may sometimes be to draw the line between punishments that are infamous and those not infamous, that punishment in the state

prison, the highest punishment known to the laws except that of death, and the only punishment now existing for crimes but recently punishable with death, is an infamous punishment. I concur also in the opinion that the citizen cannot be subjected to trial for an offence visited by a capital or infamous punishment, without the intervention of a grand jury, which, standing between him and the power of the government and the passions of the prosecutor, shall say, upon their oaths, that there is good cause why he shall be subjected to trial.

But there is, to myself, plainer and more solid ground upon which the conclusion rests, that a police court or a justice of the peace cannot be clothed with jurisdiction to try the citizen for an offence which will subject him to a capital or infamous punishment.

It is obvious to remark that, if the intervention of a grand jury is all that is wanting to the validity of this jurisdiction, the legislature might at once provide for the return of indictments into the police court, and, reserving to the accused the right of appeal, might subject him to trial even for his life, before a single magistrate. I find it impossible to assent to any such conclusion, or to any reasoning that would lead to it.

It seems to me plain that, when the Constitution declares that "the legislature shall not make any law that shall subject any person to a capital or infamous punishment, excepting for the government of the army and navy, without trial by jury," its meaning is trial by jury when and wheresoever he shall be tried ; not upon his second trial, nor after having been subjected to another and different mode of trial. If, for an offence subjecting him to capital or infamous punishment, the citizen may be tried once without a jury, it is not easy to see why he may not be so tried a second time; why the legislature may not provide that, upon appeal to the municipal court, he may be tried by a single judge, and postpone his trial by jury to his appeal to this court. Such a law would, indeed, clog and obstruct his trial by jury ; but the difference between that and this is in degree only.

The subjecting the accused to one trial by a single magistrate

obstructs the right of trial by jury, and essentially impairs its value. It places between the accused and a trial by jury a barrier not necessary for the security of the public, such as are the preliminary examination and the holding to bail. It interposes unnecessary delay between the accusation and trial by his peers. It subjects him to unnecessary and often fatally burdensome expense before he can reach the tribunal by which it is his right and his security to be tried. The subject cannot be said, under such a law, to obtain his right " freely, and without being obliged to purchase it; completely, and without any denial; promptly, and without delay."

When you state the proposition that a man may be constitutionally tried for murder by a justice of the peace or a police court, or by any single judge, even after indictment, and that he cannot have a trial by jury until he has been tried by a single magistrate, I think every mind familiar with the Constitution, and with the common law rights secured by it, shrinks from the conclusion; yet it is to be observed, that the twelfth article of the Bill of Rights makes no distinction between laws subjecting the citizen to capital and those subjecting him to infamous punishments. They stand on the same ground.

I am aware that in some text-writers of authority, and in the *dicta* of judges for whom I feel the highest respect, it has been said, that if there is an unobstructed and unclogged right of appeal to a court in which a trial by jury can be obtained, the article of the Bill of Rights is satisfied. To this view I answer,

1st. That it has never been decided in this commonwealth, that the right of trial by jury, secured by the twelfth article of the Bill of Rights for offences subjecting the citizen to capital or infamous punishment, is satisfied by a right of appeal to a court sitting with a jury; but that, on the other hand, the practical construction of this article, by all departments of the government, has been, that in relation to the higher grades of offences (in which aggravated larcenies would be included) the subject must be indicted before he can be tried, and, when indicted, can be tried only by his peers.

2dly. That it is not an unobstructed and unclogged right of

appeal, which the twelfth article secures, but an unobstructed and unclogged right of trial by jury.

In the facts that, in relation to minor offences, a different usage has obtained, both before and since the adoption of the Constitution; that when the jurisdiction of the magistrate has been extended, the grade of the offence has been reduced and the punishment diminished; that since the adoption of the punishment in the state prison no magistrate has been charged with original jurisdiction of an offence which would subject the accused to this mode of punishment, till this statute was passed — a period of forty three years — I find the strongest evidence of what has been the practical understanding of legislators and magistrates. But I feel it my duty to say that, if exceptions to this practice had been found, yet, in a matter so vitally affecting the rights of the citizen, and the mode of trial by the preservation of which in its integrity those rights can alone be secure, I should still have adhered to what seems to me the plain and obvious meaning of the Constitution itself.

With this construction of the last clause in the twelfth article of the Bill of Rights, I am of opinion that the statute giving the police court jurisdiction of aggravated larceny, with power to punish the prisoner by confinement in the state prison, is invalid, for two reasons: first, because it subjects the citizen to trial for an offence visited with infamous punishment, without presentment by a grand jury; and second, because it gives to a single magistrate power to try for an offence which can only be constitutionally tried by a jury.

MERRICK, J. Upon the principal question in the present case, I am unable to concur in the opinion expressed by a majority, and indeed by all, the other members of the court. As the effect of that opinion is a denial of the constitutional right of a coördinate branch of the government to exercise a power which, after mature reflection, I cannot doubt that it possesses, I deem it to be my duty, profoundly as I respect the judgment of my associates, and distrustful as I ought to be of my own, to state the grounds of my dissent, and the reasons by which I am led to a conclusion different from and opposite to theirs.

30 *

The petitioner is in the custody of the keeper of the house of correction, in execution of a sentence awarded against him by the police court of the city of Boston. He alleges that his imprisonment is without warrant of law, because the police court had no jurisdiction of the offence charged against him, as it is set forth in the complaint upon which he was tried, convicted and sentenced. If, upon inspection of the record, this appears to be true, he is entitled to relief, and should be discharged from imprisonment, upon being brought before this court upon a writ of *habeas corpus*. *Herrick* v. *Smith*, 1 Gray, 49.

From examination of the record it appears that a complaint, in due form and duly sworn to, was made to the police court of the city of Boston against the petitioner, wherein he was charged with stealing in a shop, there situate, certain property, of the value of fifteen dollars; that he was brought before that court, and there was arraigned, tried and found guilty of the charge set forth in the complaint; that he claimed no appeal from the judgment rendered against him, and that thereupon, in pursuance of that judgment and conviction, he was sentenced to be punished for the offence whereof he stood convicted, by imprisonment in the house of correction for the term of six months.

By the *St.* of 1855, *c.* 448, § 1, it is provided, that " the several police courts of this commonwealth shall have concurrent jurisdiction with the municipal court of the city of Boston and the court of common pleas, of all larcenies whereof the money or other property stolen shall not be alleged to exceed the value of fifty dollars; in all which cases the punishment imposed may be such as the court of common pleas and municipal court are authorized to inflict by existing laws." There is no doubt but that the last named courts have jurisdiction of offences of the like kind as that charged against the petitioner; and are authorized to sentence persons convicted thereof to the punishment of imprisonment for a term not exceeding three years in the house of correction, or for a term not exceeding five years in the state prison. Rev. Sts. *c.* 126, § 14; *c.* 143, § 19.

Upon consideration of the provisions of the *St.* of 1855, *c.* 448, all the members of the court are of opinion, for the reasons fully stated by the chief justice, that it embraces aggravated as well as simple larcenies. It does therefore expressly confer upon police courts authority to take cognizance of, and to hear and determine, all cases in which parties shall, in due form of law, and according to the known recognized and established course of proceeding in those tribunals, be brought before them, charged with the commission of any aggravated larceny by the stealing of money or property, the alleged value of which does not exceed the sum of fifty dollars; and at their discretion, upon the conviction of the accused party upon such charge, to sentence him to be punished by imprisonment for a term of years not greater than the period prescribed by law, either in the state prison or in the house of correction. If this statute is a valid and obligatory enactment, the petitioner has been lawfully tried, convicted and sentenced, and is not entitled to be relieved from his imprisonment.

But it is objected that this statute is inoperative and void, because it confers power upon police courts to sentence persons convicted of certain aggravated larcenies to the punishment of imprisonment in the state prison. It is contended that, by reason of the restrictions upon the general authority with which it is invested by the Constitution, it is incompetent for the legislature to make any law under or by force of which an alleged offender may be arrested, held to answer, tried, convicted and sentenced for the commission of a crime, the punishment of which may be by imprisonment in the state prison, without an indictment, or a presentment therefor by a grand jury, previously found and returned against him.

This objection to the validity of the *St.* of 1855, *c.* 448, is sustained by a majority of the members of this court, in whose judgment the proposition upon which it is founded is a legitimate and necessary inference from the provisions of the Constitution. I am unable to come to any such conclusion. On the contrary, it appears to me that the constitutional power of the legislature is not subject to any such restriction; but that it

possesses plenary authority to determine, by general laws, the manner in which, and the persons, officers or agents of the government, by whom, criminal accusations against alleged offenders, upon which they may be held to answer, tried, and, if convicted, sentenced for any crime or misdemeanor, may or shall be instituted or commenced. If this is correct, it is competent for the legislature, at its pleasure, to dispense altogether, or, in relation to any specified class of crimes, with the action and services of a grand jury, and to substitute in its place, and with all its powers, any other agency, either of single persons acting in their individual or official capacity, or of such associated bodies as may be constituted public prosecutors or conservators of the peace.

Of course I shall be understood as speaking only of the power and capacity of the legislature in the enactment of general laws; and not as expressing any opinion in relation to the expediency of continuing or abolishing the institution of a grand inquest. That is a topic which belongs to the deliberations of the legislature, and not to the judicial department of the government.

To determine the extent and reach of the authority of the legislature in the enactment of new laws and statutes, it is of course necessary to resort directly to the constitution itself, from which all its power is derived. We there find that full power and authority is expressly given to the general court, from time to time, as the members of whom it shall be composed shall judge to be for the good and welfare of the Commonwealth, to make, ordain and establish all manner of wholesome and reasonable orders, laws, statutes and ordinances, either with penalties or without, so only that they be not repugnant or contrary to the constitution itself. Const. *c.* 1, § 1, art. 4. And the general court is also, in like manner, further invested with similar power and authority to erect and constitute judicatories and courts of record and other courts, to be held for the hearing, trying and determining of all manner of crimes and offences, and of all pleas, processes, actions and causes, whether criminal or civil, and for making out and awarding execution thereon. art. 3.

There are undoubtedly some restrictions imposed upon the powers conferred in these broad and general terms. And it is contended that, by virtue of one of the several provisions contained in the 12th article of the Bill of Rights, the legislature is prohibited from enacting any law under which an alleged offender may, without a previous indictment or presentment of a grand jury, be arrested and held to trial upon the charge of having committed a criminal act, for which imprisonment in the state prison is prescribed as the punishment. It is there declared that "no subject shall be arrested, imprisoned, despoiled or deprived of his property, immunities or privileges, put out of the protection of the law, exiled, or deprived of his life, liberty or estate, but by the judgment of his peers or the law of the land." This is the only passage or provision in the constitution cited or relied on as having any tendency to show the existence of the supposed prohibition.

It is contended that the phrase "or by the law of the land" means, when duly interpreted, "by indictment or presentment of a grand jury." If this is the legal signification of those words, then certainly the legislature is prohibited from enacting a law like that under which the petitioner is held in custody in execution of his sentence; or, as it seems to me, any other law by force of which, without the preliminary action of the grand inquest, any subject may, for any crime or offence, be arrested, or imprisoned, or deprived of his life, liberty or estate. But if these words are not so to be interpreted, there is no restriction upon the power of the legislature to enact new laws respecting the way and manner in which criminal suits and prosecutions shall be instituted; and that department, under the general authority with which it is invested, is left perfectly free to introduce such changes, and make such new provisions on the subject as shall, from time to time, be deemed to be for the good and welfare of the Commonwealth.

It is not suggested that the words "or by the law of the land," when considered in the sense in which they are commonly and ordinarily used, import "by indictment or presentment of a grand jury"; but that, in consequence of their known usage as

a legal expression, and the technical character they have thus acquired, that signification ought to be attached to them, in the connection in which they are found in the Bill of Rights. The usage of writers and speakers in particular departments of learning or branches of business undoubtedly often diverts the meaning of words and phrases from that which they import in their common and ordinary use; and the law not unfrequently thus assigns a peculiar signification to words, when they are found in legal treatises, or availed of for legal purposes. But tried by this latter standard, I do not see that the phrases " by the law of the land," and " by indictment or presentment of a grand jury," have ever been regarded as equivalent expressions, or that they have ever been adjudged to signify only one and the same idea.

Some legal authorities are referred to, as tending to show that, under a just legal interpretation, this is the meaning of that phrase, as we find it in the twelfth article of our Bill of Rights. The same words are contained in c. 29 of *Magna Charta*, from which the declaration in our bill of rights is derived. In his commentaries upon that chapter, after quoting the words " *nisi per legem terræ*," " but by the law of the land," Lord Coke says: " For the true sense and exposition of these words, see the statute of 37 Edw. 3, c. 8, where the words, ' by the law of the land ' are rendered, ' without due process of law '; for there it is said, ' though it be contained in the great charter, that no man be taken, imprisoned or put out of his freehold, without process of the law '; that is, by indictment or presentment of good and lawful men, where such acts be done in due manner, or by writ original of the common law." 2 Inst. 50.

This passage, I think, does not show that Lord Coke meant to affirm that the words, " by the law of the land," signify merely " by indictment or presentment of good and lawful men." He rather refers to one of the then well known modes of prosecution as an instance of the manner in which proceedings might be had " by due process of law "; to which he immediately adds, as a further illustration of what may be done by due process, " or by writ original of the common law." In his further

observations upon the same words, he says : No man can be put to answer without presentment before justices, or thing of record, or by due process, or by writ original, according to the old law of the land." The careful enumeration of these four separate methods, each of which might be resorted to, to compel a party to answer, seems clearly to indicate that the writer had no intention to give to this phrase, " the law of the land," the restricted signification which is supposed. What he afterwards says upon the same subject is still stronger to the same effect. " Now here it is to be known," he says, " in what cases a man, by the law of the land, may be taken, arrested, attached or imprisoned, in case of treason and felony, before presentment, indictment, &c." 2 Inst. 51. And again : " Now seeing that no man can be taken, arrested, attached or imprisoned, but by due process of law, and according to the law of the land, these conclusions," in respect to the character and contents of warrants and legal processes which he particularly points out, " hereupon do follow." 2 Inst. 52. The implication from these passages is certainly very strong, that the phrase " the law of the land," as it is used in the great charter of liberties, was not understood by Lord Coke to be synonymous with " indictment or presentment by a grand jury." See also Care's English Liberties, (Boston ed. 1721,) 25. This may be said with the greater confidence, since it is well known that, by the common law, there were various modes of instituting criminal prosecutions, quite distinct and separate from the action and presentment of the grand inquest, of which it is not possible to suppose that he could have been ignorant. For it is said by Sergeant Hawkins, " it is every day's practice, agreeable to numberless precedents, to proceed by way of information, either in the name of the attorney general, or of the master of the crown office, for offences done principally to a private person ; as for batteries, cheats, seducing a young man or woman from their parents for any wicked purpose, perjuries, forgeries, conspiracies ; as well as for offences done principally to the king, as for libels, seditious words, riots, extortions, nuisances," and various other enumerated offences. 2 Hawk. *c.* 26, § 1. Bac. Ab. Information, B

Of recent commentators, whose opinions have been supposed, erroneously as it seems to me, to sanction the doctrine that, under the provisions of *Magna Charta*, a presentment by the grand inquest is essential to the legality of all criminal prosecutions, or at least in relation to those wherein the convict may be subjected to an infamous punishment, reference has been made to Mr Justice Story and to Chancellor Kent. In his Commentaries on the Constitution of the United States, the former, after noticing other parts of the fifth article of the amendments, observes, that the declaration that no person shall be deprived of his life, liberty or property, " without due process of law," is but an enlargement of *Magna Charta*, " *nec super eum ibimus, nec super eum mittemus, nisi per legale judicium parium suorum, vel per legem terræ.*" And, after quoting what is said by Lord Coke concerning the sense and exposition of these latter words, he adds, " so that this clause affirms in effect the right of trial according to the process and proceedings of the common law." Story on Const. U. S. §§ 1783. This language is somewhat loose and indefinite; and the precise meaning of the author may not therefore be perfectly understood. But certainly he could not have intended by this to assert that the terms " presentment by the grand inquest " and " by due process of law " were of one and the same import and signification; since the article of amendment, upon which his discussion is founded, mentions them both, and makes a manifest and marked distinction and .contrast between them.

The commentary of Chancellor Kent, when fully considered, does not seem to admit of the supposition that he assigns to the phrase " by the law of the land " the circumscribed and narrow signification, to which it is limited when held to be only a designation of one particular method in and by which a person may be legally accused of, and prosecuted for, a criminal offence. He says, indeed, that these words, " as used originally in *Magna Charta*, are understood to mean ' due process of law,' that is, by indictment of good and lawful men ; and this, says Lord Coke, is the true sense and exposition of those words." But to prevent the reader from misapprehending it to be his intention to

assert, or admit, that this special instance and illustration should be accepted as a statement of the principle, he immediately adds: " The better and larger definition of ' due process of law ' is ' law in its regular course of administration, through courts of justice.' " 2 Kent Com. 13.

There are many cases in which this definition of Chancellor Kent is directly or incidentally sanctioned ; but there are none, which I have been able to find, in which the phrases " by the law of the land " and " presentment by a grand jury " have been adjudged to be equivalent or synonymous terms. Thus in *Taylor* v. *Porter*, 4 Hill, 140, it was held, that a statute authorizing a private road to be laid out across the land of a person, without his consent, was unconstitutional and void, because even the right of eminent domain cannot be exercised except under a general law, interpreted and administered in the due course of proceeding in courts of justice. The words " due process of law," said Mr. Justice Bronson, " cannot mean less than a prosecution or suit, instituted and conducted according to the prescribed forms and solemnities, for ascertaining guilt, or determining the title to property. It will be seen that the same measure of protection is extended to life, liberty and property ; and if the latter can be taken away without a forensic trial and judgment, there is no security for the others." It is the forensic trial, under a broad and general law, operating equally upon every member of our community, which the words " by the law of the land," in *Magna Charta*, and in every subsequent declaration of rights which has borrowed its phraseology, make essential to the safety of the citizen, securing thereby both his liberty and property, by preventing the unlawful arrest of his person or any unlawful interference with his estate. *Jones* v. *Perry*, 10 Yerg. 59. *Wally* v. *Kennedy*, 2 Yerg. 554. *In re John & Cherry Streets*, 19 Wend. 676. *Hoke* v. *Henderson*, 4 Dev. 15.

There is evidence in the legislative action of the Province, that, long before the adoption of the Constitution, the people dwelling here were not disposed to rest wholly upon *Magna Charta*, or on the great body of English liberties. They made

a declaration for themselves. The rights and liberties of the freemen of the province were set out in one of the earliest acts of the legislative assembly under the provincial charter; and although that act was annulled by an order of the King in council as soon as it was reported and known to the imperial government, and was never afterwards in force or recognized as having any legal effect or authority, it is none the less indicative of the opinions which were then here entertained upon the subject. In that declaration, the distinction between "the law of the land," or, as it is there expressed, "the law of the province," and "presentment by a grand jury" was made the basis of distinct and separate propositions. It was first provided that no freeman should be taken, imprisoned, outlawed, passed upon, adjudged or condemned, "but by the judgment of his lawful peers, or the law of this province"; and then followed the further distinct and independent provision, that "in all capital cases there shall be a grand inquest, who shall first present the offence." Anc. Chart. 214. This last provision, so cautiously inserted and so explicit in determining what should be the sole mode of prosecuting offences of the highest grade, was wholly futile and unnecessary, if the "law of the land" meant exactly the same thing as "the presentment of a grand jury."

When the Constitution of this commonwealth was written, the words "*per legem terræ*" from *Magna Charta* were selected and inserted in the twelfth article of the Bill of Rights, instead of transferring to it the peculiar phraseology of our provincial declaration. The signification of each form of expression, however, was the same. This is apparent from several considerations. A few years later, the Constitution of the United States, framed in a convention of delegates from the several independent sovereignties then existing, was submitted to the people of Massachusetts for their adoption. It is well known to have been in the convention, to whose deliberations its acceptance or rejection was referred, one serious ground of objection to its adoption, that it contained no provision for the security of the citizen against the danger of public criminal prosecutions. To obviate that objection an amendment was proposed, which was subse-

quently accepted by the requisite number of states, and now forms part of the Constitution, providing " that no person shall be held to answer for a capital or otherwise infamous crime, unless on a presentment or indictment by a grand jury, except in cases arising in the land and naval forces, or in the militia when in actual service in time of war or public danger." This is explicit; and I think that the fact of the incorporation of this amendment into the Constitution clearly shows that, at that time, the words, " by the law of the land " had not acquired, and were nowhere understood to have the meaning of those other words, " by indictment or presentment of a grand jury." For, if such was known and understood to be the settled, technical and legal meaning and signification of those words, as used in their bill of rights, the people of Massachusetts, when seeking for security and demanding protection against prosecutions for capital or other infamous crimes under the authority and laws of the United States, would naturally, and almost necessarily, have used and availed themselves of the same comprehensive and expressive terms which, for a like purpose, they had incorporated into their own constitution. But it was not so. And in looking at the report of the debates in the convention, to see how this subject was then treated and considered, it is apparent that no one then supposed that there was any provision in the Bill of Rights, or in any part of the Constitution of Massachusetts, relative to the existence or the action of a grand jury. It was said, during the discussion upon this subject, and obviously with studied caution and upon careful reflection, by Mr. Gore, one of the ablest lawyers and statesmen of that day, that " no provision is made in the Constitution of Massachusetts for an indictment by a grand jury, or to oppose the danger of an attorney general filing informations." This broad statement appears to have been universally acquiesced in ; not an individual expressed a different opinion, or intimated any suggestion that such a provision existed by force of, or could justly be derived from, the principles asserted in the twelfth article of the Bill of Rights, or might be derived from any peculiar signification which ought to be attached to the words " by the

law of the land." Debates in Convention of 1788, (ed. of 1856,) 214.

Considering the time, the place and the circumstances under which this opinion was expressed, and that not one of the able and vigilant members of the convention in which it was clearly and distinctly asserted then intimated the least doubt of its correctness, it deserves to be considered as a deliberate judgment, and is entitled to the weight of an authoritative contemporaneous exposition of the sense and meaning of this particular article in the Bill of Rights and of the general provisions of the Constitution. It was undoubtedly so considered at that time; and it appears to have been ever since tacitly acquiesced in and conceded. It has not hitherto been denied or brought into question in any controversy which has arisen, or by any adjudication in our courts of law. On the contrary, so far as our judicial decisions have gone, upon questions involving this inquiry, they tend rather to strengthen, support and confirm it. It was thus in the judgment upon an information filed by the solicitor general against the inhabitants of Waterborough, for neglecting to be provided with a public protestant teacher of piety, religion and morality. In giving the opinion of the court in that case, Parsons, C. J. says: " It is a general rule that all public misdemeanors, which may be prosecuted by indictment, may be prosecuted by information in behalf of the Commonwealth, unless the prosecution be restrained by statute to indictment." *Commonwealth* v. *Waterborough,* 5 Mass. 259. And in a later case this opinion was incidentally affirmed. Judgment appears to have been actually entered upon a verdict rendered upon an information filed and prosecuted in the county of Suffolk by the attorney for the Commonwealth; and sentence awarded thereon for the penalty prescribed by statute as the punishment of an act prohibited and made criminal. Various other exceptions were taken and argued in behalf of the defendant; but neither his counsel nor any one else seems to have entertained a doubt of the right of the government to maintain the prosecution, because it was not founded upon the presentment of a grand jury. *Commonwealth* v. *Hooper,* 5 Pick. 42.

This precise question was brought most distinctly to the attention of the Convention assembled in 1820 to revise the Constitution of the Commonwealth. And it is obvious, from all the proceedings which took place in relation to it — from the debates, the resolves adopted, and the final action of the convention — that it was the unanimous opinion of all the delegates, that there was then no existing provision in the Constitution, requiring a presentment by the grand inquest as the foundation of a criminal prosecution. A resolution was offered, proposing to amend the Declaration of Rights, so that no person should be liable to be tried for an offence, the punishment of which should be imprisonment, or otherwise ignominious, but upon the presentment of a grand jury. Mr. Parker of Boston, then the chief justice of this court, "said, it was remarkable that, when the Constitution was drawn up by persons so careful of the rights of the citizen, no provision was made to guard them in this particular. The common law is in force here, and by it the attorney and solicitor general had authority to file informations in cases under felony." It is worthy of observation, and material in this connection, to consider, that it was then perfectly well known that there were many offences below the grade of felony, of which the law took cognizance, such, for example, as forgery and perjury, which might thus be prosecuted upon the mere information of the law officers of the government, and which, by the express provisions of the statutes of the Commonwealth, subjected convicts to infamous punishment, and to imprisonment and confinement to hard labor in the state prison. *Sts.* 1804, *c.* 120, § 1; 1812, *c.* 144, § 5. Mr. Parker " proceeded to state the probable reasons, founded on some provincial laws to which he referred, why the provision was not made in the Constitution, and to state more at large the reasons why it should be made now." Some of the delegates objected, for various reasons, which they assigned, to the adoption of the resolution; but no one of them denied anything that was said by Chief Justice Parker, or attempted to point out any statement or clause in the Constitution, which required the action or existence of a grand jury. The resolution was adopted; and

31 *

finally the convention prepared an amendment of the Constitu-
tion, founded upon it, in these words : " No person shall be sub-
jected to trial for any crime or offence for which, or on conviction
thereof, he may be exposed to imprisonment, or to any igno-
minious punishment, unless upon a presentment or indictment
by a grand jury ; except in cases which are or may be otherwise
expressly provided for by the statutes of the Commonwealth."
No direct vote was ever given by the people upon this single
proposition.    The amendment was united with another, upon a
very different subject, which proved not to be acceptable to
them, and both were rejected by the popular vote.    But it is
difficult to see how there can be any stronger evidence than is
to be found in the deliberations and expressed opinions of the
members, and in the final action of the convention, that down to
that period in the history of the Commonwealth, it was no-
where understood or supposed that, under a just interpretation
of any clause in the Bill of Rights or other part of the Constitu-
tion, a preliminary investigation and presentment by a grand
jury were indispensable to the legal validity of a criminal prose-
cution.    Debates in Convention of 1820, (ed. 1853,) 467, 468,
572, 614, 633.

Evidence to the same effect is also afforded in various
acts of legislation under the Constitution, and in the practical
construction thus given to its provisions.    Soon after, but
nearly contemporaneously with its adoption, courts of general
sessions of the peace were established, and empowered to hear
and determine all matters relative to the conservation of the
peace, and the punishment of the offences of which they were
authorized to take cognizance.    The jurisdiction of those courts
was very broad ; extending, as it has since been judicially ascer-
tained and determined, to everything which, in the then existing
state of the law, did not relate to life, member or banishment.
*Commonwealth* v. *Holmes,* 17 Mass. 336.    Yet in the statute by
which they were created, express provision was made concern-
ing the issuing of warrants and processes " for the apprehending
and bringing to trial any person against whom an indictment
is found or a complaint filed, for any crime " whereof the

court was capable of taking cognizance; thus treating these two modes of proceeding — by indictment and by complaint — as of equal force and validity, and declaring, by an inevitable implication, so far as it was competent for the legislature to declare, that, under the Constitution, a criminal prosecution may be legitimately instituted and pursued, and the alleged offender brought to trial, and, if convicted, subjected to punishment, as well without, as with the intervention and presentment of a grand jury. *St.* 1782, *c.* 14, §§ 1, 2. Other provisions are not less significant. Informations are recognized as well known and legal processes, by force of which, in the recovery of forfeitures incurred under penal statutes, individuals may lawfully be deprived of portions of their property or estate. *St.* 1788, *c.* 12, § 1. And in some instances the privilege of an election has been given of resorting to that mode of proceeding, or to a prosecution by indictment, for the recovery of penalties prescribed as the punishment of acts prohibited by law; as in the case of selling, or offering or advertising for sale, tickets in lotteries, not authorized by the laws of this commonwealth, when the maximum of forfeiture was fixed at two thousand dollars. *Sts.* 1825, *c.* 184, § 1 ; 1833, *c.* 148, §§ 1, 2. The third section of the statute last cited goes much further, affecting not only the property, but also the liberty of the citizen. It first provides that any person convicted of any one of the several offences therein enumerated shall be punished by imprisonment and confinement to labor in the state prison for a term not less than one nor more than three years; and it then proceeds to determine what shall be the effect of a particular species of evidence, if produced upon a trial, " of any prosecution, whether by indictment or by information ;" thus incidentally, but distinctly, recognizing the latter as a mode of prosecution equally as legal and effectual as the former, and upon which a convict may be sentenced to suffer the most severe and rigorous imprisonment authorized by law.

Similar illustrations might be educed, if it were necessary to pursue the inquiry, from the various statutes in which judicial power and authority in criminal cases is conferred upon inferior

tribunals — upon police courts and justices of the peace. All prosecutions before police courts or justices of the peace are necessarily instituted by complaint, upon the oath of the party by whom it is made; and never by a formal presentment because grand jurors are never in attendance upon these courts. Yet they are fully empowered to hear and determine many criminal cases; to cause accused parties to be brought before them for trial; and, upon conviction, to sentence them to punishment by the payment of fines or suffering imprisonment either in the common jail or in the house of correction.

In another and more striking form the legislature has very deliberately indicated an opinion as to its right to determine, at its discretion, in what class of offences the presentment of a grand jury shall be indispensable to the institution of a criminal prosecution, and how far, and upon what occasions, the old common law process of information shall be allowed in its place. Upon the revision of the statutes in 1836, the commissioners — stating in a manner which makes it apparent that they did not suppose that their proposition could be exposed to any doubt or disputation, that " our constitution does not mention an indictment " — proposed that a law should be enacted, that no person should be held to answer for any crime or offence punishable by the infliction of death, or by imprisonment in the state prison, unless upon indictment by a grand jury. Commissioners' Report, *c.* 123, notes. The committee of amendments, to whom this recommendation was first referred, followed out the principle of the suggestion; but, varying the form and substance of the proposed law, so as at once both to uphold, and to show what was understood to be the extent of the constitutional right of the legislature, reported the section of the statute, which was finally enacted, declaring therein that no person should be held to answer, in any court, for an alleged crime or offence, unless upon an indictment by a grand jury; except where a prosecution by information should be expressly authorized by statute, and in proceedings before police courts, justices of the peace and courts martial. Committee's Amendments, 149. Rev. Sts. *c.* 123, § 1.

This clear and distinct reservation of the right to authorize, in whatever cases it should choose to do so, the institution of criminal prosecutions by information, is a manifest denial that the Constitution, by any of its provisions, had subjected the power of the legislature, on this subject, to any restraint or limitation. They who constituted its members when this statute was enacted, could not possibly have understood that, according to the principles set forth in the 12th article of the Bill of Rights, no citizen could be arrested, imprisoned or deprived of his liberty nor of his estate, but by indictment or presentment of a grand jury; for the exact opposite of all this, was provided for by them in the law which they thus sanctioned and established.

It was in the exercise of that power, then so plainly and significantly claimed and asserted by the legislature as its undoubted right, that the statute now under consideration, by force of which the petitioner is held in custody, was enacted. Under the general authority conferred upon it, by the broadest terms, by the Constitution, it was certainly competent for the legislature to ordain and establish such a law, unless by some provision in another part of the same instrument, that authority is specially, or by necessary implication, so curtailed and limited as to forbid or disallow it. And confessedly no such restraint exists, if the phrase, " by the law of the land," in the 12th article of the Bill of Rights — the only clause referred to or supposed to import such limitation — is not to be interpreted, at least in relation to all offences to which an infamous punishment, such for example as imprisonment in the state prison, is attached, as a prohibition against the enactment of any law, by force of which the life, liberty or property of a citizen may be jeoparded through the prosecution of any criminal accusation against him, other than such as shall be founded upon the presentment and action of a grand jury. I can see no sufficient reason for adopting such an interpretation. On the contrary, in view of the considerations already presented, whether the phrase is considered in reference to the usual and ordinary signification of the words of which it consists, or to any legal or technical

meaning which, in the course of time, they may have acquired, or in the light of any judicial decision hitherto promulgated, or according to the understanding which has long and widely, if not indeed universally, prevailed among statesmen, jurists and legislators upon this subject, it appears to me that such an interpretation is erroneous and unwarranted.

But a further and definite objection is urged against the validity of this statute. In conferring upon police courts jurisdiction of all larcenies, where the alleged value of the stolen property does not exceed fifty dollars, it gives them also power to sentence convicts, for certain of the offences embraced in it, to imprisonment in the state prison. And it is insisted that, this being an infamous punishment, the legislature is not authorized to empower those inferior tribunals to subject persons under judgments rendered by them to punishments of such a description. It is impossible, I think, upon a just and reasonable construction of any part or provision of the Constitution, to maintain that objection. If, disregarding the great and fundamental question of constitutional authority and right, we were at liberty to advert to other considerations, it might perhaps be thought to have been inexpedient and injudicious to clothe the judicial officers appointed to administer justice in those courts, with powers of such magnitude and importance. And it is possible that, in the enactment of the particular statute under consideration, the most careful and deliberate attention was not directed to the measure and extent of the punishment which may be inflicted by virtue of its provisions. But if it were allowable to enter into speculations of this kind, nothing could be found in them sufficient to invalidate a law otherwise duly enacted. The legislature alone has the right, and it is moreover its especial duty, to decide definitively upon this and all kindred questions of expediency in establishing laws and ordinances for the common welfare. The material inquiry here however has no relation to the utility or expediency of particular acts of legislation, but is limited and confined to the question concerning the constitutional power and right of the legislature in the enactment of laws declaring in what manner criminal accusations shall be

instituted, what punishments may be imposed upon parties convicted of specified offences, and in what tribunals such punishment may be awarded. And upon the most careful scrutiny of the Constitution, it will be seen that it nowhere makes any distinction whatever between offences or designated classes of criminality, in relation to the method, form or manner in which criminal prosecutions concerning them shall be commenced. Nothing of that kind is prescribed in the organic law, but the whole subject of process and course of procedure in judicial tribunals is left to the future regulation of the legislature in the exercise of its general and independent authority. If the phrase " by the law of the land " were to be construed as if it was precisely equivalent to the expression " by presentment of a grand jury," it is obvious that there then could be no difference or distinction in the origin and commencement of prosecutions against persons charged with the commission of different offences ; for, upon such an interpretation, the preliminary action of a grand jury would be indispensable to any and every criminal prosecution, and must be resorted to and relied upon indiscriminately in reference to all crimes and offences of every grade and description. But if this is not a just interpretation of that portion of the Bill of Rights, and if no such principle is to be deduced from it, then there is nothing to hinder the legislature from ordaining and defining, in and by statutes duly enacted, the method, form and course of proceeding in which breaches of the peace and violations of the criminal code may be pursued. The Constitution does declare, in clear and explicit terms, that the " legislature shall make no law that shall subject any person to a capital or to an infamous punishment, excepting for the government of the army and navy, without trial by jury." This most material provision is attached to and follows immediately after the declaration of the liberties and immunities of the citizen, as they are set forth in the twelfth article of the Bill of Rights, and constitutes an essential portion of it; so that any statute for the punishment of persons alleged to have been guilty of any crime or misdemeanor, without adequate provision for a trial by jury, must necessarily be invalid.

Jones *v.* Robbins.

But in no other place, and in no other manner or particular, is infamous punishment mentioned or alluded to in the Constitution. It is there brought prominently into view and carefully specified, for the obvious purpose of ensuring to the citizen that the right of trial by jury upon every criminal prosecution, which can by possibility subject him either to a capital or infamous punishment, shall be inviolably pursued. But it goes no further than this. It does not allude, in the remotest degree, to the manner of instituting prosecutions, nor afford the least intimation that the kind, nature or degree of the punishment to be inflicted, is to influence, control or affect the method, process or course of proceeding against the party accused. So far from this, the very reverse appears to be an unavoidable conclusion. The mention of infamous punishment directly, but only in relation to trial by jury is, upon well settled principles of interpretation, an exclusion of its application to other purposes, or to other objects of a different character. *Expressio unius est exclusio alterius.* To make a provision which, by its own terms, is applicable solely to the manner in which a cause or an accusation shall be tried, exercise an absolute and controlling influence over the method, form or manner in which it shall be instituted or begun, is too wide a departure from the obvious import of language to admit of its being accepted as a true or just interpretation.

For these reasons I am of opinion that the *St.* of 1855, *c.* 448, is a valid and constitutional enactment; and consequently that the petitioner is not entitled to be discharged from his imprisonment.

NOTE. By *St.* 1857, *c.* 157, the *St.* of 1855, *c.* 448, is repealed; and concurrent jurisdiction is given to police courts to punish larcenies of money or property, not alleged to exceed fifty dollars in value, by imprisonment in the county jail or house of correction not exceeding two years, or by fine not exceeding one hundred dollars.